SUMMONS ISSUED



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
CLERK

2011 MAR 15 AM 9:08

U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK

---

LONG ISLAND HOUSING SERVICES, INC.

Plaintiff,

v.

MAIN STREET, L. I., LLC and BRADFORD P. MOTT,

Defendants.

Civ. **CV11-1210** (ECF)

COMPLAINT

BIANCO, J.

BOYLE, M.J.

---

Plaintiff, Long Island Housing Services. Inc. ("LIHS" or "Plaintiff"), by its

attorneys, Emery Celli Brinckerhoff & Abady LLP, for its Complaint against Defendants Main

Street, L.I., LLC ("Main Street") and Bradford P. Mott alleges as follows:

## INTRODUCTION

1.      In Patchogue and Central Islip, Suffolk County, New York, the owner and

manager of five apartment complexes discriminate against people with disabilities by imposing

fees and surcharges to tenants with service animals, quoting higher rent for the same size

apartment, and refusing to change rental policies to accommodate renters' disabilities.

2.      A 2008-2009 testing investigation by Plaintiff Long Island Housing

Services, a non-profit organization dedicated to ending housing discrimination, also revealed that

the Defendants' agents were steering prospective renters with physical disabilities away from

their apartment complexes by encouraging them to look elsewhere or telling them that

apartments were not available to rent when in fact they were.  One of Defendants' agents refused

to communicate by telephone with a tester about renting an apartment because the tester used a

1

relay operator service that people with hearing impairments need in order to communicate by telephone.

3.      These explicit policies and practices violate federal and state fair housing laws that prohibit discrimination based on disability, including requiring landlords to modify their rental policies to reasonably accommodate renters with disabilities.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, 28 U.S.C. § 2201 and 42 U.S.C. § 3613.  This Court has supplemental jurisdiction over the New York State law claims pursuant to 28 U.S.C. § 1367.

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because all the Defendants reside in the District, the events giving rise to the claims occurred in the District, and these claims concern or otherwise relate to real property located in this District.

6.      Plaintiff filed administrative complaints regarding the allegations contained herein with the U.S. Department of Housing and Urban Development ("HUD") against the Defendants on November 10, 2009 and March 2, 2010.  The complaints were subsequently referred to the New York State Division of Human Rights (DHR) for investigation.  On June 29, 2010 and June 30, 2010, the complaints were each dismissed by DHR for administrative convenience.

## THE PARTIES

7.      Plaintiff LIHS is a private non-profit fair housing advocacy organization serving Long Island, New York and organized under the laws of New York, with its principal place of business in the District in Bohemia, New York.

8.    Main Street L.I. LLC is a New York corporation with offices at 29 West Main Street, Oyster Bay, New York and is the owner and manager of the following five apartment buildings:

(a) Maple Tree Apartments, 90-98 Maple Avenue, Patchogue, New York ("Maple Tree");

(b) East Winds Apartments, 887 Montauk Highway, Patchogue, New York ("East Winds");

(c) Coventry Village Apartments, 100 Coventry Lane, Central Islip, New York ("Coventry Village");

(d) Terry Apartments, 38 Rider Avenue, Patchogue, New York ("Terry"); and

(e) Rider Terrace Apartments, 75 Rider Avenue, Patchogue, New York ("Rider Terrace")(collectively, "the Apartments").

9.    During all relevant times, Defendant Bradford P. Mott was a licensed real estate broker operating in New York and a member of Defendant Main Street.  Upon information and belief, Mr. Mott personally (a) establishes the rental policies for Main Street; (b) supervises two rental agents working at the Apartments and employees in the administrative office of Main Street; and (c) oversees the general operation and management of the Apartments.

10.    Defendants maintain a rental office at Terry Apartments that provides rental management services to Terry and Rider Terrace Apartments.  Maple Tree, East Winds, and Coventry Village each have their own rental offices.  In addition, Defendants maintain a centralized administrative office referred to by its agents as the "main office" that is not located at any of the Apartments.

11.    The rental units of the Apartments are "dwellings" within the meaning of 42 U.S.C. § 3602(b) and "housing accommodations" within the meaning of Article 15 of the New York Executive Law § 292(10).

## FACTS

12.    The primary objectives of LIHS are to (a) promote equal housing opportunity and racial and economic integration; and (b) reduce and eliminate housing discrimination.  These objectives include ensuring that people with disabilities have equal access to housing in Long Island.  LIHS pursues these goals by providing counseling services to individuals and families about fair housing and landlord/tenant rights, homelessness prevention, mortgage default, pre-purchase and rental strategies, and government assisted housing programs. LIHS promotes compliance with fair housing laws by (a) conducting fair housing investigations, including testing; (b) providing education and outreach for both housing consumers and industry-related providers; and (c) serving as a clearinghouse for housing-related information.

13.    Among other things, LIHS recruits, trains, and utilizes individuals as "testers," who are persons that pose as renters or homebuyers for the purpose of obtaining information about the conduct of landlords, real estate companies, agents, and others to determine whether illegal housing discrimination is taking place.  Prior to conducting the tests at the Apartments described below, the testers received training from LIHS, which included instructions on conducting a test and preparing tester report forms and narratives.

14.    In the course of its work on behalf of people protected by fair housing laws, including people with disabilities, LIHS became aware of complaints of housing discrimination based on disability at the Apartments.  In response, LIHS undertook several

4

actions, including conducting a testing investigation of the Apartments between 2008 and 2009, and filing administrative complaints with government agencies.

**August 2008 Tests (Terry, Rider Terrace and Coventry Village Apartments)**

15.     On or about August 12, 2008, LIHS sent HC, a male tester, to the rental office at Coventry Village Apartments.  HC presented himself as a man searching for an apartment to rent on behalf of his disabled sister who had a service animal.  HC met with a woman named Michelle, one of Defendants' rental agents at Coventry Village.  After HC told Michelle about his sister's service dog, Michelle told him that she would have to check with the Defendants' main office to see if the company's weight limit on pets and related fees including a $300 non-refundable fee and an additional monthly rent of $50 could be waived.

16.     Later that same day, HC received a voice mail message from Michelle stating that the service animal's weight exceeded the company's pet requirements.  HC returned Michelle's call on the same day and was told by her over the telephone that the main office had decided that the service dog was too big.

17.     On or about August 14, 2008, LIHS sent RS, a female tester to the rental office at Terry Apartments.  RS presented herself as a woman looking for an apartment to rent on behalf of her father who used a wheelchair and had a service animal.  RS met with a woman named Adrianna, one of Defendants' rental agents at Terry Apartments.  Initially, Adrianna told RS that she was not sure of the Defendants' policy regarding a dog and made a telephone call to obtain more information while RS waited.  After the phone call, Adrianna told RS that dogs up to 25 pounds were permitted.  In addition, Adrianna told RS that her father would have to pay a non-refundable fee of $300 for the service animal and then an extra $50 per month in rent.

18.     On or about October 9, 2008, LIHS sent male tester HC to the rental office at Terry Apartments to inquire about an apartment to rent at Rider Terrace. As he had in August, HC continued to present himself as a man looking for an apartment to rent on behalf of his disabled sister who had a service animal. HC met with Adrianna at Terry Apartments. When HC explained that his sister was disabled and had a service dog that was over the company's weight limit for pets, Adrianna telephoned the main office while HC waited. After the telephone call, Adrianna told HC that his sister would have to bring documentation to prove she needed a service dog and that the Defendants might reduce the additional monthly rent or waive it after reviewing the documentation. Adrianna did not offer to waive the $300 non-refundable pet fee.

**February 2009 Tests (Terry, Rider Terrace and Coventry Village Apartments)**

19.     On or about February 12, 2009, LIHS sent NS, a female tester presenting herself as a married woman with a physically disabled husband who used a wheelchair and had a service dog, to the rental office at Terry Apartments to inquire about an apartment to rent. NS met with Adrianna at the rental office at Terry Apartments who informed NS that the Defendants had policies regarding pets that would be applied to NS including both a weight limit and a $50 monthly surcharge. NS told Adrianna that her husband's service dog was over the weight limit and asked if the weight restriction policy could be waived. Adrianna agreed to call the Defendants to discuss NS' request.

20.     On or about February 13, 2009, NS left a voice mail message at the phone number given to her by Adrianna the day before, inquiring about her request to waive the pet weight restriction and asking the Defendants to waive the additional monthly rent. Approximately an hour later, NS received a call from Adrianna who said she had not yet checked voice mail messages. NS asked Adrianna if she had checked with the management company

about waiving the weight limit policy and Adrianna replied that she had forgotten to do so. NS also asked Adrianna if the additional monthly rent would be waived. Adrianna replied that she did not think the Defendants would waive the additional rent, but agreed to speak with the Defendants and call NS back.

21.    On or about February 20, 2009 and February 24, 2009, NS telephoned Defendants' agent at Terry Apartments but no one answered the phone. Since February 13, 2009, NS has not received any telephone calls from Defendants or any of their agents about her request that Defendants waive their policies of charging tenants with service animals a monthly surcharge and imposing a weight limitation on a service animal.

22.    On or about February 17, 2009, LIHS sent OG, a female tester presenting herself as a person with disabilities who received a retirement disability pension and Social Security Disability, to the rental office at Terry Apartments. Upon information and belief OG met with, Adrianna, the same rental agent for Terry Apartments as NS met with, and was shown apartments at both Terry and Rider Terrace Apartments. OG informed Adrianna that she received her monthly pension by direct deposit on the 6th of each month. Adrianna told OG that if she did not pay rent within the first five days of each month, she would be assessed a late fee. OG asked Adrianna if the Defendants would modify their policy so that she could pay rent on or shortly after the 6th of each month without being assessed a late fee. Adrianna stated that the Defendants would not modify the policy.

23.    On or about February 19, 2009, LIHS sent female tester NB to the rental office at Coventry Village Apartments to inquire about an apartment to rent. NB presented herself as a single woman without a disability who had a pet dog. NB met with Michelle at approximately 1:35 p.m. who told her that she could reduce the rent for a one-bedroom

7

apartment from $1235 per month to $1150 per month. Michelle also offered to contact her boss

to request a reduction in the amount of the pet fee since NB had a dog. NB did not ask Michelle

for a reduction in rent or the pet fee.

24.     Less than two hours after NB met with Michelle, LIHS sent female tester

NS to the rental office at Coventry Village Apartments to inquire about an apartment to rent. As

she had on February 13th when she went to Terry Apartments, NS presented herself as a woman

with a husband who used a wheelchair and had a service animal. NS met with Michelle at

Coventry Village at approximately 2:50 p.m on or about February 19, 2009.

25.     During her visit, NS told Michelle that her husband used a wheelchair and

had a service animal that exceeded the weight restriction on dogs mentioned by the agent. NS

asked Michelle if the weight restriction could be waived and Michelle said she would call the

main office to find out. Michelle told NS that because of the service animal, Defendants would

require a $300 non-refundable fee and additional rent of $50 per month neither of which could be

waived. In contrast to how she treated the non-disabled tester, NB, earlier that afternoon,

Michelle did not offer to ask her supervisor if the pet fee could be reduced for NS.

26.     During the visit on February 19, 2009, Michelle told NS that the rent for a

one-bedroom apartment at Coventry Village would be $1235, but that she could lower it to

$1205. In contrast, Michelle offered earlier in the afternoon to lower the rent for the same size

apartment for the non-disabled tester to $1150, which was $55 less per month than the best price

Michelle quoted to NS.

27.     Finally, during the visit on February 19, 2009 by NS to Coventry Village,

unprompted by NS, Michelle called an apartment complex in Lake Grove that was not owned by

Defendants to inquire on behalf of NS about any restrictions regarding animals. Michelle told

8

NS that the Lake Grove complex did not have a weight restriction but had a breed restriction that might apply to NS and would not be waived. Nonetheless, Michelle steered NS away from Coventry Village and to the Lake Grove apartment complex to inquire about apartments to rent. In contrast, Michelle did not steer the non-disabled tester away from Coventry Village, but instead encouraged her to apply for an apartment at Coventry Village even though the non-disabled tester said she had a pet dog.

28.    On or about February 20, 2009, NS called the rental office at Coventry Village and spoke to Michelle with whom she had met the previous day. Michelle told NS she did not have an answer from the main office regarding the requests by NS to have the Defendants' policies waived regarding weight restrictions, additional fees, and monthly surcharges. Michelle then asked NS whether she had contacted the Lake Grove apartment complex not owned by the Defendants to inquire about an apartment to rent.

29.    On or about February 24, 2009, NS telephoned the rental office at Coventry Village and spoke again with Michelle who told NS that she had just arrived at the rental office, had not checked messages, and would call NS back. Since this conversation, NS has not received any telephone calls from Michelle, the Defendants, or any of their other agents.

**October 2009 Test (East Winds and Maple Tree Apartments)**

30.    On or about October 29, 2009 and continuing into October 30, 2009, MDR, a LIHS female employee, conducted a test by presenting herself as a deaf person and using a telephone relay operator to inquire about a studio apartment for rent at East Winds Apartments. Upon information and belief, Adrianna answered the phone and communicated with MDR each time MDR called East Wind. On October 29, 2009, Adrianna hung up on MDR

approximately three times, even though the relay operator explained to Adrianna what a relay operator is and the purpose of the call.

31.   On approximately the fourth attempt to telecommunicate using a relay operator on or about October 29, 2009, MDR was able to and did inform Adriann at East Wind Apartments that she was calling about an apartment to rent. MDR explained to Adrianna through the relay operator that she was a deaf person and was told about one-bedroom and studio apartments available for rent at East Winds. MDR then told Adrianna that MDR received Social Security Disability on the second Wednesday of each month and inquired if she would be allowed to pay rent at that time without incurring a late penalty fee. Adrianna initially stated that rent could be paid on the second Wednesday of each month. When MDR asked for the address for a studio apartment, she was told by Adrianna to go to Maple Tree Apartments, despite Adrianna knowing that there are no studio apartments at Maple Tree. MDR was not told about available studio apartments to rent at East Wind which has studio apartments. MDR asked again whether she would have to pay a late fee if she rented a studio apartment and paid rent on the second Wednesday of each month. MDR was left waiting without a reply and then Adrianna terminated the call without answering the question.

32.   On or about October 30, 2009, MDR contacted East Winds using a relay operator and attempted to speak with Adrianna. MDR was told by Adrianna that she was with someone and asked MDR to call back an hour later.

33.   At the same time as MDR was on the telephone with Adrianna on or about October 30, 2009, another female tester KZ arrived at the rental office for East Wind Apartments. KZ presented herself as a prospective renter with no disabilities. When she arrived, KZ observed that Adrianna was on the telephone speaking with someone and then observed her

hang up the telephone. After hanging up the telephone, Adrianna made negative comments to KZ about the person she was talking to on the telephone stating that it was like talking to a computer and took too long. Upon information and belief, Defendants' agent, Adrianna, was referring to tester MDR when she made these comments to KZ.

34.     On or about October 30, 2009, Adrianna told the non-disabled tester KZ that she had both studio and one-bedroom apartments available to rent at East Winds even though the previous day she told MDR through a telephone relay operator that there were no studio apartments available to rent at East Winds.

35.     On or about October 30, 2009, the same female non-disabled tester, KZ, went to the rental office at Maple Tree after completing her conversation with Adrianna at East Winds. When KZ arrived at Maple Tree, she met with a woman named Dawn, who, upon information and belief, is one of Defendants' agents. KZ inquired about a studio apartment for rent and was told by Dawn that there were no studio apartments located at Maple Tree, only one- and two-bedroom apartments.

**Injury Caused By Defendants' Policies and Practices**

36.     By reason of the foregoing, Plaintiff LIHS has been directly and substantially injured and frustrated in its mission to eradicate discrimination in housing on Long Island, and in its efforts to carry out the programs and services it provides, including encouraging integrated living patterns, educating the public about fair housing rights and requirements, educating and working with industry groups and others on fair housing compliance, and providing counseling services to persons either looking for housing or affected by discriminatory housing practices.

11

37.     LIHS has also been damaged by having to divert scarce resources that could have been used to provide the services described in the preceding paragraph to instead identify and counteract the Defendants' discriminatory conduct.  These activities include, but are not limited to, providing information and intake counseling to individuals contacting LIHS with allegations of housing discrimination; conducting tests; drafting, filing, and assisting with administrative housing discrimination complaints; engaging in mediation efforts; and other related activities regarding the Apartments.

38.     The unlawful discriminatory conduct of Defendants will continue to injure LIHS by *inter alia*:

(a)     Interfering with Plaintiff's efforts and programs intended to bring about equality of opportunity in housing, including ensuring that multifamily rental developments are made available to people with disabilities, including those who may request reasonable accommodations;

(b)     Requiring the commitment of scarce resources, including substantial staff time, to investigate the discriminatory conduct of the Defendants, and counteract their discriminatory conduct, thus diverting those resources from other services; and

(c)     Frustrating the Plaintiff's mission and purpose of promoting equal availability of housing to all persons without regard to any protected characteristic, including disability.

39.     The Defendants' discriminatory conduct also deprives individuals to whom LIHS provides services, and others living in and near the Apartments of the benefits of living in a diverse community that includes persons who have disabilities, as well as those who do not.

## COUNT I

### Fair Housing Act
(42 U.S.C. § 3601 *et seq.*)

40.     Plaintiff repeats and realleges the foregoing paragraphs of its complaint as though fully set forth herein.

41.     Defendants' conduct, as described above, constitutes representations made because of disability[1] that a dwelling is not available for inspection or rent when such dwelling was in fact so available, in violation of Section 804(d) of the Fair Housing Act, 42 U.S.C. § 3604(d).

42.     Defendants' conduct, as described  above, constitutes making housing otherwise unavailable to rent because of disability in violation of Section 804(f)(1) of the Fair Housing Act, 42 U.S.C. § 3604(f)(1).

43.     Defendants' conduct, as described above, constitutes discriminating against any person in the terms, conditions, or privileges of rental of a dwelling because of disability in violation of Section 804(f)(2) of the Fair Housing Act, 42 U.S.C. § 3604(f)(2).

44.     Defendants' conduct, as described above, constitutes refusing to make reasonable accommodations in rules, policies, practices or services for renters with disabilities in violation of Section 804(f)(3) of the Fair Housing Act, 42 U.S.C. § 3604(f)(3).

45.     Plaintiff LIHS is an aggrieved person as defined in 42 U.S.C. § 3602(i), has been injured by the Defendants' discriminatory conduct, and has suffered damages as a result.

---

[1] In Count I, Plaintiff uses the term "disability" interchangeably with the term "handicap" as defined in Section 3602(h) of the Fair Housing Act, 42 U.S.C. § 3602(h).

46.     The Defendants' conduct was intentional, willful, and made in reckless disregard for the rights of others.

47.     Accordingly, under 42 U.S.C. § 3613(c), Plaintiff is entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

## COUNT II
### New York State Human Rights Law
(New York Executive Law § 290 *et seq.*)

48.     Plaintiff repeats and realleges the foregoing paragraphs of its complaint as though fully set forth herein.

49.     Defendants' conduct, as described above, constitutes the withholding of a housing accommodation and the representation that a housing accommodation is not available for inspection, rental, or lease when in fact it is so available, because of disability in violation of Article 15 of the New York Executive Law § 296(5)(a)(1).

50.     Defendants' conduct, as described above, constitutes discrimination in the terms, conditions or privileges of rental or lease of a housing accommodation on the basis of disability in violation of Article 15 of the New York Executive Law § 296(5)(a)(2).

51.     Defendants' conduct, as described above, constitutes a refusal to make reasonable accommodations in rules, policies, practices, or services to afford a person with a disability equal opportunity to use and enjoy a dwelling in violation of Article 15 of the New York Executive Law § 296(18)(2).

52.     Plaintiff has been injured by the Defendants' discriminatory conduct and has suffered damages as a result.

53.     The Defendants' conduct was intentional, willful, and made in reckless disregard for the rights of others.

14

54.     Accordingly, under Article 15 of the New York Executive Law § 297, Plaintiff is entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

## COUNT III
### Suffolk County Local Law
(Suffolk County Local Law No. 51-2006)

55.     Plaintiff repeats and realleges the foregoing paragraphs of its complaint as though fully set forth herein.

56.     Defendants' conduct, as described above, constitutes representing that a housing accommodation is not available for inspection, rental or lease when in fact it is so available, or to otherwise withhold any housing accommodation because of disability in violation of Section 89-12(B)(1)(a) of Suffolk County Local Law 51-2006.

57.     Defendants' conduct, as described above, constitutes discrimination in the terms, conditions or privileges of rental or lease of a housing accommodation on the basis of disability in violation of Section 89-12(B)(1)(b) of Suffolk County Local Law 51-2006.

58.     Defendants' conduct, as described above, constitutes a refusal to make reasonable accommodations in rules, policies, practices, or services to afford a person with a disability equal opportunity to use and enjoy a dwelling in violation of Section 89-12(B)(1)(f) of Suffolk County Local Law 51-2006.

59.     Plaintiff has been injured by the Defendants' discriminatory conduct and has suffered damages as a result.

60.     The Defendants' conduct was intentional, willful, and made in reckless disregard for the rights of others.

61.     Accordingly, under Section 89-12(C)(20) of Suffolk County Local Law 51-2006. Plaintiff is entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment against the Defendants as follows:

(a)     Declaring that Defendants' discriminatory practices violate the Fair Housing Act, as amended, 42 U.S.C. § 3601 *et seq.*; and the New York State Human Rights Law, New York Executive Law § 290 *et seq.*;

(b)     Enjoining Defendants and their agents, employees, and successors, and all other persons in active concert or participation from:

(i)     Denying or withholding housing, or otherwise making housing unavailable, because of disability;

(ii)    Representing to any person that a dwelling is not available for inspection or rental when such dwelling is in fact so available because of disability;

(iii)   Discriminating in the terms, conditions, or privileges of rental because of disability;

(iv)    Refusing to grant a renter with a disability a reasonable accommodation to rental rules, policies, practices, or services;

(v)     Coercing, intimidating, threatening, or interfering with any person in the exercise or enjoyment of any right granted or protected by the Fair Housing Act; and

       (vi)    Aiding, abetting, inciting, compelling, or coercing the doing of any of the acts forbidden by the New York State Human Rights Law;

(c)    Enjoining Defendants and their agents, employees, and successors, and all other persons in active concert or participation to:

       (i)    Make all necessary modifications to their policies, practices, and procedures to comply with fair housing laws;

       (ii)    Train all management, agents, and employees on fair housing laws;

       (iii)    Display an Equal Opportunity logo (or statement to that effect) on all advertisements and rental application forms for rental property and display in all offices HUD, state, and local fair housing posters;

       (iv)    Develop written procedures on rental process and fair housing policy, including a policy for reasonable accommodations, to be distributed to all employees, agents, tenants, and rental applicants;

       (v)    Allow monitoring of their application process, rental decisions, and handling of requests for reasonable accommodations;

       (vi)    Retain records to allow for appropriate monitoring; and

       (vii)    Establish a system for testing its employees and agents for unlawful discriminatory practices;

(d)    Awarding such damages to Plaintiff LIHS as will fully compensate for the diversion of resources and frustration of mission caused by the Defendants' unlawful practices.

(e)    Awarding punitive damages to Plaintiff LIHS;

(f)  Awarding Plaintiff LIHS reasonable attorneys' fees, costs, and expenses incurred

in prosecuting this action; and

(g)  Granting Plaintiff LIHS such other further relief as may be just and proper.

Dated: March 15th, 2011

EMERY CELLI BRINCKERHOFF
& ABADY LLP

By:  _____
      Diane L. Houk
      Mariann Meier Wang
      75 Rockefeller Plaza, 20th Floor
      New York, New York 10019
      Telephone: (212) 763-5000
      Facsimile: (212) 763-5001

*Attorneys for Plaintiff*